[No. 2438.]

## WILLIAM TAYLOR v. THE STATE.

1. PRACTICE—COMPETENCY OF A WITNESS—CASE STATED.—The defense, in a prosecution for rape, moved the trial court to test the prosecutrix upon her *voir dire* as to her competency as a witness with regard to the nature and obligation of an oath. The trial judge granted the motion, tested the witness and pronounced her

incompetent. Thereupon the State requested and obtained permission of the court, over the defendant's objection, to take the witness from the court house and to the private law office of prosecuting counsel, and there, in the presence of the sheriff, instruct her properly with regard to the nature of an oath, and read and explain to her the statutes with regard to the crime of perjury and its punishment. The witness was then returned into court, was re-examined as to her competency, and was held competent by the judge, and, over the objection of the defense, was permitted to testify. *Held,* that the entire proceeding subsequent to the first test applied by the court was erroneous. See the opinion *in extenso* on the question.

2. SAME—EVIDENCE—CHARGE OF THE COURT.—The defense objected, during the examination of the prosecutrix, as often as she was permitted to testify as to other criminal acts of the defendant perpetrated upon her, of a like nature to that for which he was on trial. This evidence is *held* admissible under the rule that " it is permissible, when motive is the important question, to prove other acts of a similar nature." But in such cases the charge of the court should explicitly explain to the jury the purpose for which alone the testimony was admitted ; and in this case such a charge was indispensable, and its omission fatal error in view of the fact that the other criminal acts testified about were barred by the statute of limitations.

3. SAME—LEADING QUESTIONS.—To the general rule that leading questions can not be propounded to witnesses, exceptions are recognized when the witnesses are unwilling, or are of weak memory, and when such a mode of questioning is logically consistent with a fair and honest development of the case. Moreover, the rule obtains in this State that it is within the discretion of the trial court to allow direct questions to a witness who shows an unwillingness to testify. It was shown in this case that the witness had positively refused to testify on the examining trial, and had to be confined in jail before she consented to testify. *Held,* that, under the circumstances, the trial court did not err in permitting the State, on direct examination, to propound leading questions to the witness.

4. ASSAULT TO RAPE.—Note the concluding paragraph of the opinion, to the effect that *threats,* unaccompanied by *force,* as a means resorted to to obtain sexual intercourse with a female, will not support a conviction for assault to rape, and will authorize only a conviction for attempt to rape.

APPEAL from the District Court of Clay. Tried below before the Hon. B. F. Williams.

The indictment in this case charged the appellant with the rape of Jane Taylor, who is shown by the evidence to be his own daughter, in Clay county, Texas, on the twenty-seventh day of December, 1885. His trial resulted in his conviction of assault

with intent to rape, and he was awarded a term of seven years in the penitentiary.

Tom Taylor was the first witness for the State. His testimony was too disconnected to be paraphrazed intelligibly, and is therefore set out in full, and was as follows: "I am sixteen years old, and was in Henrietta at the date of the offense charged. I saw a difficulty between the defendant and Jane Taylor, who is my sister. The difficulty occurred about nine o'clock at night. My mother was not in the room with me and Jane. My sister was in bed about three feet from mine. My Pa, the defendant, came into the room and tried to get in bed with Jane. He hit her over the head with a pistol. She tried to get him to go away. He stayed about ten minutes. My mother got up and he went out. I saw him come in six or seven times. He would come in and try to get in bed with her, and she would not let him. This was in November or December, 1885, in Clay county, Texas. I would be awake when he would come in, and I would raise up and look at him. I never said anything to him. There was a difficulty at our house in which I took a part. At the commencement of this difficulty the defendant was in my mother's room. Just before this he was in my sister's room. I was asleep. The first time I saw him he was in my mother's room. After I went in defendant and mother were fussing. Mother tried to get him to let her alone. He made me go back into the room. I then saw him with a common pair of scissors in his hand, trying to strike Ma. My sister went into the room and took hold of defendant. The scissors were about six inches long. Defendant threw up his arm, Jane caught it, and I went into the other room and got a gun and shot him. He dropped the scissors, hallooed, and said that I had shot him. I reloaded and held the gun up to shoot him again, and he grabbed it, and it went off and shot my sister in the leg. Phil Hill first got there, and then Mr. Miller."

Cross examined: " I know what the charge in this case is. It is rape. I have been testifying about a fight. I went to bed about ten or eleven o'clock. I testified that before. I don't know when father, mother or Jane went to bed. Defendant and Ma and Jane were drinking together. I drank some too. The fuss between Pa and Ma in Ma's room woke me up. This was the first time I had seen my father after I went to bed that night. I don't know myself if Pa was in Jane's room that night. My sister said so, and that is all I know. Pa said that he would

knock me down if I did not go back to bed. My Ma is larger than Pa. Sister is nearly as heavy as Pa. Jane caught Pa by the right arm. Ma had hold around him when I shot him. I was afraid Pa would kill Ma. After he dropped the scissors he hallooing "murder," and trying to get loose, when I tried to shoot him again. It was in December when I saw Pa hit Jane with a six shooter. Her head did not bleed. He hit her two or three times. My two little brothers were sleeping in the room at the time. The first time Pa came to sister's bed was November 28, 1885, and the second time about the last of November. He wouldn't stay very long. I heard him every time. I would raise up and look at him. I had the gun pointed at my father's head the second time I attempted to shoot him. I had it cocked when he grabbed it. Jane don't like Pa. I don't hate him. He never got in bed with her when I saw him, nor attempted to."

The next witness for the State was Jane Taylor, the daughter of the defendant, and the party upon whom the unnatural crime is charged to have been committed. She is likewise the witness who first disqualified herself upon her *voir dire*, and who was subsequently invested with competency by the proceedings upon which, principally, the conviction is reversed, and the same whose reluctancy to testify called forth the objections of the defendant upon which is based the ruling of this court announced in the third paragraph of this report. She testified that at the time of this trial she had attained the age of eighteen years, and weighed fully one hundred and nineteen pounds. She slept at home, the house of the defendant, on the last night of December, 1885. The defendant, armed with a pistol, came to the witness's bed after she retired, and threatened to kill her if she made a noise. He struck her with the pistol and then seized her with his hands. He then placed the witness face down on the bed, with her feet touching the floor, and from his standing position behind the witness, placed his body against hers. The evident purpose of the witness to curtail her narrative, if possible, at this point of conjunction, elicited from the prosecution the pregnant inquiry whether or not the defendant, from his pose of vantage, sought to penetrate her with an object of any kind, and, if so, did he succeed, and with what character of instrument? These pertinent questions extorted from witness the avowal that the defendant penetrated her sexual organ with his male member. Upon the question of consent the prosecution pressed its investigation into that channel, but met the witness's

indignant protest that the invasion of her privates was without her consent and against her will. She made no outcry at the time because she was afraid of the defendant, who, as stated, was armed with a pistol.

Further responding to the searching questions of the prosecution, the witness stated that the outrage described was not the first one of the kind perpetrated upon her by the defendant. He had previously, as often as five or six times, reduced her to submission to his carnal passion. He often beat and whipped the witness. On one occasion he whipped her with a quirt, and then struck her with the quirt handle. On another occasion he whipped her with a gun. On still another occasion the witness fled from him, joining her mother in the garden, to which her said mother had gone about thirty minutes before the defendant had approached the witness, appealing to her to submit to his sexual appetites. On that occasion he argued to the witness that copulation between them involved no act of moral wrong, and that others, including Mr.——, under like circumstances, did it. The witness was thirteen or fourteen years old when the defendant first compelled her to gratify his sexual desire. They were then in camp on the hither side of Long's creek. They had attended a show in town on that night and had proceeded as far as the camp on their way home. They did not stop at the creek, because it was up, but the defendant said he could not cross. Defendant secured connection with the witness on that night only after a scuffle. They crossed the creek on the next morning and went on home. The witness did not tell her mother about the defendant forcing her in the camp until about two weeks afterwards, because she was afraid. The defendant, on the way home next morning, while Tom, his son, was walking, told witness that he would kill her if she told what happened in camp, and that if he thought Tom knew it he would kill him and hide his body in the bushes. Tom was drunk— made so by the defendant—while in camp on the night of the first outrage. Referring, as well as the reporters can understand the witness, to the particular act involved in this prosecution, the witness said that the defendant commenced talking ugly to her on that night, and told her that it was as good a night as any to "do it." Continuing, she said: "I went out of the dining room into the kitchen, and went down to Mrs. Reeves's. I went from there to the court house, where I saw Mr. Turner, and swore to a paper before him. When I left, Mrs. Wilson

was talking to the defendant. She went there so that I could get away. I told Ma the next day after the defendant had done that way to me in December. He hurt me that night, and it hurt me the first time he did me that way. Tom was in the room with me in December. I don't know whether he was drunk or not. Ma was in another room sick. She was pretty sick, and was taking medicine. I believed he would kill me that night."

The cross examination to which this witness was subjected was searching and rigid. She testified that she was absolutely certain that the last rape, the one under investigation, was perpetrated upon her by the defendant on the night of the last day of December, 1885. One of the witness's brothers slept with her that night and her other two brothers slept in the same room. The defendant and his wife, the witness's mother, occupied the adjoining room. The witness's feet were on the floor during the perpetration of the carnal act. She was not sitting on the bed, but her body from her hips up was on the bed. She lay as the defendant placed her, face down, across the bed, her private parts extending from the bed and her feet on the floor, the defendant inserting his male member into the witness's sexual organ from behind her, he at the time standing on the floor. Defendant did not get in front of witness until after he performed the carnal act in the manner stated. He was dressed in his night clothes only. The room door was closed and there was no light in the room. The light flooding the room from without, through the raised blinds of the window, enabled the witness to see the pistol in the defendant's hand. It was between two and three o'clock when the defendant accomplished the rape of the witness on this occasion, but he had been in the room several times on that night. Two or three years had then elapsed since his last ravishment of the witness. This last act of rape referred to—the one next preceding the one under investigation—took place about two years prior to December, 1885, at the defendant's house in the country. The witness's mother and the other children were then absent on a visit to some of the neighbors, and no one was left about the house but the witness and the defendant. The defendant told the witness that then was a "pretty good time to do it," took hold of the witness, who was some distance from the bed, pushed her to the bed, laid her down upon it, pulled up her clothes, and, by force, had carnal knowledge of her person. It took defendant on that occasion

about five minutes to accomplish his purpose, in doing which he hurt the witness very much. Witness screamed and begged the defendant to desist on that occasion, but to no purpose. He did not again subject the witness to that treatment on that day.

Continuing, the witness asserted that, beyond all manner of doubt, the defendent got his privates "in" on the occasion of his assault upon her in camp on Long's creek. She could not now say how long it took him to perform that job, nor did she remember what he said to her. She did remember, however, that he hurt her. The parties, including Tom, were in the wagon at the time of that rape, but witness could not now say that the defendant's performance upon her was on or under the blanket. That act was perpetrated in the fall of the year, and was the witness's first actual contact with the sexual organ of a man. She had on her clothes, including her drawers, which was a closed garment. Defendant managed to pull the drawers down despite the witness's struggle. The witness screamed throughout the process of copulation, because it was attended with great physical pain to her. He made but one assault upon the witness that night. All the other of defendant's carnal acts upon the witness were perpetrated in his house. On each occasion he sent his wife to visit some of the neighbors, and the children to play out of doors. He sent Mrs. Taylor to Snearlie's on one occasion, which was in the forenoon. They then lived in the country. Their house had two rooms below and an apartment up stairs. On the occasion that he sent Mrs. Taylor to Snearlie's, he came into the room where the witness was and told her that he wanted to "do it." Witness told him that she did not. He then caught the witness, and, as he always did, pushed her down on the bed, opened his pants, got on the bed, pulled up the witness's clothes, and went to work. The witness had never worn any but closed drawers. She had on her drawers once when the defendant "did it" to her at home. She did not now remember whether or not she took off her drawers before she got on the bed on that occasion. She just unbuttoned both sides of her drawers. The witness never pulled down her drawers herself, at all. She did not know exactly how far down the defendant usually pulled them, but not further down than her knees. She could not now remember whether defendant usually got her drawers down first, or unbuttoned his pants first. He always pulled up the witness's dress himself. She could not remember what disposition she usually made of

her hands while the defendant was subjecting her to his passion.

The carnal process was always attended with physical pain to the witness, but the first experience was the most painful. None of the various experiences to which she was subjected afforded her any enjoyment or pleasure. The defendant never remained in bed with the witness after sexual connection with her, but invariably got up and left as soon as he got through. Witness could not now recall what she generally said to him. On one occasion, not previously mentioned, the defendant raped the witness out in his yard, near the house. It was then two or three hours after dark. The witness and the defendant went together to the place where the outrage was perpetrated, which place was in the open, on the grass, near a hay stack, some thirty steps from the house. Mrs. Taylor was then in bed. Both witness and defendant had been to bed. The defendant went to the place in his drawers, and the witness, according to the best of her recollection, in her night clothes. The operation was a painful one to the witness on that night, and she failed to scream only because the defendant would not permit her. Defendant occupied some ten or fifteen minutes "doing it" that time. After they got through, the witness and defendant went back into the house. Witness went to bed that night some time before the defendant came to her room to get her to go to the hay stack. Before she retired that night, the witness went up stairs and tried to get her brothers to sleep in her room, knowing that, as defendant had purposely made her mother drunk, he intended to ravish her, witness. Witness had drunk no liquor that night that she could now remember. She was not addicted to drinking, and drank only when some one compelled her to.

The witness testified further that she knew Minnie Smith, but denied that she ever told Minnie that on one occasion the defendant waited for her at an agreed place, and that she went to him. She did not remember that she ever talked to Minnie Smith about this matter. Minnie was at the defendant's house nearly every day. They bathed together one day, but the witness said nothing to her on that occasion about this matter. The witness did not know whether or not she ever told Minnie Smith how often she and defendant had had criminal intercourse. The defendant came to witness's bed several times at night in December, 1885, but witness always succeeded in arousing her mother by pinching one of the children. The witness

was afraid to say anything on the night of the outrage now under investigation. He struck the witness with his pistol on one occasion before that night. He tried to get into the kitchen in which the witness then was, but witness closed and locked the door, and made him mad. Witness and her brother Tom had never been in bed together since they were children. The witness knew Phil Hill and his wife. She never told Mrs. Hill that her brother Tom had been in the habit of getting into bed with her. No body but the defendant had ever had sexual intercourse with the witness. The witness had stayed some at Mr. McCuller's house, some at Mr. Johnson's house, and some at Doctor Dickinson's house since the arrest of the defendant for the offense now on trial. She had talked some with Mrs. Dickinson about this case. Mrs. Dickinson told her to tell nothing but the truth about this matter, but to tell the truth.

The witness remembered the circumstances of her visit to Judge Stine's office in connection with this case, early in 1886. She remembered some talk at Doctor Dickinson's house about this case about that time. Mr. Dickinson and Mr. Barret were the only persons present at first, but witness's mother soon came. The witness could not remember what was said prior to her mother's arrival. Witness declined to tell any thing about the defendant's assault upon her. An effort was made to induce her to tell all about her father's conduct towards her, and was asked why she would not tell. Mr. Barret said, in effect, that, unless the witness testified, a rope would be placed round her father's neck and he be pitched out of the court room window. Defendant was then in jail, and witness declined to tell any thing. It was several days after this before the witness made complaint and had defendant arrested. The witness did not remember who she saw in the forenoon before she made the complaint against the defendant. Defendant was at home during a part of that day, and had been at home every night for a week previous, keeping sober during that time. Mrs. Wilson came to defendant's house on the day that witness made the complaint. She came to enable witness to go to the court house. Witness did not see that any body came with her. Defendant was in his room playing cards by himself, and witness was washing the supper dishes when Mrs. Wilson arrived. Up to that time no one had urged witness to make complaint against the defendant. She did not know that any body else had, or not, and did not know that she was ever taken before Judge

Stine as a witness in this case. She supposed that when she was taken before Judge Stine, early in 1886, it was to testify in this case. She may have been taken before him for that purpose twice. Witness had no recollection of stating before Judge Stine that her father, the defendant, had never had carnal intercourse with her by force, and without her consent. She did not remember what she did testify to before Judge Stine.

Testifying further, the witness stated that the defendant had carnal intercourse with her, five or six times in all. She knew Mr. Mundy, the county attorney of Clay county, but she never had a conversation with him in which she told him that she and her father had copulated oftener than twenty times. She told Mr. Mundy something about it—she did not now know what. Defendant and his family, including witness, had been living in the town of Henrietta about a year, having moved from the country about nine months after the defendant got back from an extended trip through Tennessee, Kentucky, and perhaps other States. The family raised corn and cotton while living in the country. Defendant was a mean, unkind man to his family when they lived in the country. Witness has never had any children, and had never been pregnant. Witness thought that Mr. Templeton represented the defendant. When the witness was before Judge Stine the second time, she was asked if the defendant ever struck her over the head with a pistol. She did not know what she said in reply. Witness's mother owned some houses in Henrietta. Doctor Dickinson acts as Mrs. Taylor's adviser with respect to her property. Mrs. James, Mrs. Swinburne, Mrs. Harness and Mrs. Dickinson advised with witness about this matter, appealing to her to tell the truth about it.

On her re-direct examination, the witness, referring to the carnal act near the hay stack, said that the defendant came to her room that night after she had gone to bed, and told her to go to the hay stack. He had said nothing to her about sexual intercourse before on that night. Witness had not yet taken off her clothes. Defendant had previously procured whisky and made his wife drunk. Witness wept, and refused to go, but defendant compelled her to go. The witness had a consultation with Mr. Hazlewood, one of the attorneys for the defendant, on the night before she testified before Judge Stine about this matter. Mr. Hazlewood said that witness could refuse to testify in the case if she wanted to, but that in all probability, if she did, she would be confined in jail, and kept not over thirty minutes.

The witness did not remember all that Mr. Hazlewood said to her, but she learned from some source, before she appeared be- fore Judge Stine, that if she testified to the facts in this case she would be sent to the penitentiary, and she believed it. She thought that the lawyers didn't want her to testify; she was afraid to testify to the facts, did not testify to them then, and went to jail. The witness could not say why she thought the lawyers did not want her to testify. She could not say who she got that idea from, but there were so many lawyers talking that they left the matter very much mixed in the witness's mind. To the question: "Who talked to you?" the witness replied: "Plemons, Hazlewood and Templeton were all there and talked to us." Defendant got out of jail on bond and talked to witness. He told witness not to go to court and testify. The witness did not tell him whether she would or not. She did not recollect what else the defendant said about it. Defendant generally said that he was going to sleep with witness, and that people would not know it.

Re-cross examined, the witness stated that she had spoken to Mr. Hazlewood two or three times. Judge Plemons and Mr. Templeton, on one of their vists to the witness, told her that Mr. Hazlewood was gone. If either Judge Plemons, Mr. Hazlewood or Mr. Templeton said any thing to witness about going to the penitentiary if she testified to the facts in this case, the witness could not recall it. Mr. Hazlewood said that witness could decline to testify upon the ground of criminating herself. Defendant was not then present, Mrs. Taylor was. Mr. Templeton was present. On another occasion Mr. Templeton and Judge Plemons being present, some thing was said about the witnesses being taken off, and that, if Mr. Hazlewood was at home, he could take witness and her brother Tom off. Mr. Hazlewood talked with the witness more than once. He asked her, a few days before this trial, for her mother's address. If Mr. Hazlewood ever told the witness that, if the facts in this case were as they had been told to him, both witness and defendant were guilty, and ought to be sent to the penitentiary, the witness did not remember it. Some body, but neither Plemons, Hazlewood nor Templeton, said that if defendant escaped conviction and got free he would kill the whole family. Witness's mother told her that she would go to the penitentiary if she testified to the actual facts on this trial, and the witness merely guessed that that information came from Plemons, Hazlewood or Templeton.

Witness presumed that her action before Judge Stine's court was influenced somewhat by what Mr. Hazlewood told her about going to jail for contumacy. Instead of being kept in jail thirty minutes, witness was kept in custody two days and one night. She then became frightened, and concluded that she had to tell in order to get her release. No one during that time visited the witness to get her to testify. Mr. Barret came to the jail and said that if witness wanted to go home her only way was to testify to the facts. The witness finally went before Judge Stine and testified. The witness repeated that she could not say that it was either Judge Plemons, Mr. Hazlewood or Mr. Templeton who said that if she testified she would be sent to the penitentiary.

E. B. Mundy testified, for the State, that he was the county attorney of Clay county when the examining trial of the defendant was held before Judge Stine. It was the recollection of the witness that when Jane Taylor was first brought before Judge Stine's tribunal she refused to swear to anything. Witness, representing the State, asked her if the defendant had ever had carnal intercourse with her. She began shaking her head in the negative when witness began the question and kept that motion up. Witness could not recall all of the subsequent testimony of Jane Taylor before Judge Stine.

R. D. Welborne was the next witness for the State. He testified that he represented the defendant on the examining trial, in the absence of Plemons, Hazlewood and Templeton. Mr. Barret asked Jane Taylor, when she first took the stand, if "Parker" Taylor, the defendant, ever struck her over the head with a pistol. Jane refused to answer the question. After several ineffectual efforts to get her to answer the question Mr. Mundy asked her if the defendant ever had carnal intercourse with her and she said that he never had. She did not refuse to answer that question. The State closed.

The defense first introduced witnesses to support the character of the defendant for peace and quietude, and for personal honesty. Five or six, who had known him for various periods since 1877, declared that his reputation for honesty and fair dealing had been good; that he was regarded as a peaceable, law abiding man, with the exception that he was addicted to gambling, and that he had been kind and considerate to his family. One witness had heard of one or two insignificant combats in which he had been engaged. One of the witnesses pro-

nounced Jane Taylor's reputation for truth and veracity to be bad.

R. R. Hazlewood testified, for the defense, that he was in Washington City, D. C., when he heard of defendant's arrest upon this charge. When he got back to his home in Henrietta, the defendant sent for him. Witness first declined the invitation to call upon the defendant. After being sent for several times, the witness and his partner, Mr. Templeton, went to defendant's house, and found him in bed, suffering from the gun shot wounds inflicted by his son. His daughter Jane, the prosecuting witness against him, and his wife, were present. Witness and Templeton remained at his house about thirty minutes. Witness told defendant at first that he would have nothing to do with the case until his fee was secured. He further told defendant, in the presence of his wife and daughter, that if the facts of the case were properly reported on the streets, he and his daughter were both guilty of incest and ought to be sent to the penitentiary. Mrs. Taylor then asked if Jane would be compelled to testify in the case. Either the witness or Mr. Templeton told her in reply that Jane could not be compelled to criminate herself, but that, if she refused to testify, the court in all probability would order her to jail, and might keep her there until she consented to testify and did so. Nothing whatever was said by either the witness or Templeton to induce her not to testify.

Judge W. B. Plemons next took the stand for the defense, and repelled indignantly the inferential suggestion of the witness Jane Taylor that he, or any member of his firm, ever connived at the suppression of evidence in this case, or the concealment of witnesses. The witness and his partner, Templeton, visited the defendant's house together on one occasion, when Mrs. Taylor asked some kind of a question about sending the children off. Witness told her instantly and positively that he did not practice law on principles of that kind. Neither the witness nor Templeton told Mrs. Taylor, Jane, or any one else, that Hazlewood was then absent, but would arrange to take the children off when he got back. Two members of the firm always went together to see the defendant and his family, as a matter of precaution and protection, because they were afraid of them.

J. A. Templeton, the junior member of the law firm of Plemons, Hazlewood & Templeton, was the next witness for the defense. He testified that his firm was first employed to defend

in this case during Mr. Hazlewood's absence in Washington City. Judge Plemons and the witness went to see Mrs. Taylor two or three times before Mr. Hazlewood got back home. The defendant had previously transferred his property to Mrs. Taylor and he had nothing with which to secure the fee. Judge Plemons and witness went to see Mrs. Taylor about securing the fee. Mrs. Taylor refused at first to secure the fee. A night or two previous to the examining trial, Mr. Hazlewood having returned, he and witness went to see Mrs. Taylor, and she agreed to make some arrangements about the fee. A day or two later Mrs. Taylor paid part of the fee and secured the balance. No member of the firm ever went back to Mrs. Taylor's after the fee was secured until the night before the examining trial, when witness and Mr. Hazlewood called. Mrs. Taylor said that Jane did not want to testify in the case and asked if she could decline to do so. Witness told her that, under the law, she could not be compelled to testify to facts that would criminate or disgrace herself. Jane then got a piece of paper and a pencil and asked what questions she could decline to answer. Both witness and Hazlewood flatly refused to post her and told her she could refuse to answer only such questions as would tend to show that the defendant had intercourse with her by her consent, in which event the crime of incest would be disclosed against her. Jane then asked if she would be sent to jail if she refused to answer and witness replied that in all probability she would. The first visit to the Taylor family was made by witness and Judge Plemons together. Mrs. Taylor, in Jane's presence, bewailed the disgrace that had befallen upon her family, and said that she wanted to take her children and move away as soon as she could. She wanted to send Jane and Tom off, and asked that a conveyance for the purpose be furnished, with which the witness and Judge Plemons declined positively to have anything to do.

Neither Judge Plemons nor witness ever told Mrs. Taylor or Jane that Mr. Hazlewood would take Jane off when he came back. Mr. Hazlewood never, in the presence of the witness, told Mrs. Taylor or Jane that if Jane testified to the facts in the case she would be sent to the penitentiary. The witness heard Jane Taylor testify, on the defendant's examining trial in January, 1886, that the defendant never did go to her bed and compel her, against her will and consent, to submit to his carnal passion, and that he never attempted such a thing.

The motion for new trial raised the questions discussed in the opinion.

*Plemons, Hazlewood & Templeton,* and *E. J. Hamner* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This appeal is from a judgment of conviction for assault with intent to commit rape, the punishment being seven years in the penitentiary. The injured party was the daughter of appellant, and the conviction rests almost exclusively upon her uncorroborated testimony. According to her statements as a witness, appellant had ravished her first some five years prior to the date of the crime for which he was being tried, and she deposed that his crime had been repeatedly perpetrated upon her in the interval between the first and last offense. After the testimony at the trial was closed, the defense demanded that the prosecution be required to elect the precise and specific offense for which a conviction would be claimed, and the prosecution announced that they would claim a conviction only upon the offense as laid in the indictment, to wit, the one committed on or about the twenty-seventh of December, 1885.

Before her examination as a witness, defendant requested the court to have the prosecutrix tested upon her *voir dire* as to her competency with regard to the nature and obligations of an oath. This was granted, the witness examined in open court, and pronounced incompetent by the judge. Thereupon, at the request of the prosecuting attorneys, and over objection of defendant, the said prosecuting attorneys were permitted to take said witness from the court room to the private law office of one of said attorneys, that they might there instruct her properly, in the presence of the sheriff, with regard to the nature of an oath, and read and explain to her the statutes with regard to the crime of perjury and its punishment; after which the witness was again brought back into court, re-examined as to her competency, and pronounced competent by the judge, and she then testified in the case. All of which was excepted to by defendant.

Our statutes, while they declare that no person shall be disqualified from giving evidence on account of his religious opin-

ions, or for the want of any religious belief (Bill of Rights, sec. 20; Code Crim. Proc., Art. 12), do hold as incompetent "children or other persons who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated, or who do not understand the obligations of an oath." (Code Crim. Proc., Art. 730, subdiv. 2.) The method of testing the competency of such witnesses is confided to the discretion of the trial judge, and his determination of the question will not ordinarily be disturbed on appeal, unless an abuse of that discretion is apparent. (Brown v. The State, 2 Texas Ct. App., 115; Ake v. The State, 6 Texas Ct. App., 398; Brown v. The State, Id., 286; Williams v. The State, 12 Texas Ct. App., 127; Burk v. The State, 8 Texas Ct. App., 336.)

Was the mode adopted in this instance an abuse of discretion? Mr. Wharton says: "When a child is incompetent simply for want of instruction as to the nature of an oath, the practice has been to postpone the case, so that the child might in the meanwhile be properly instructed." (Whart. Crim. Ev., 8 ed., sec. 368, citing Rex v. White, 1 Leach, 430.) This was the English practice. As far as known, it has never been adopted in this country. On the contrary, as Judge Lewis says, in State v. Scanlan, 58 Mo., 206, such "practice has been criticised as like preparing or getting up a witness for a particular purpose." (S. C., 1 Amer. Crim. R., Hawley, 185.) In Indiana, where the witness on a trial for rape was a child only six years old at the time of the trial, and was testifying sixteen months after the alleged offense, the competency of the witness having been challenged, the court examined her, and not being satisfied, appointed two gentlemen who retired with the child to a private room, and after some time returned and reported to the court that in their opinion her testimony ought to be heard, but received with great allowance, whereupon she was allowed to testify, over defendant's objections, it was *held* that for this action of the court the defendant was entitled to a new trial. (Simpson v. The State, 31 Ind., 90.) In Alabama, where the question was "whether the circuit court was authorized to arrive at a conclusion respecting the admission or rejection of an infant witness from *a private examination after a public examination in court* had resulted in the exclusion of the witness in consequence of an apparent defect of knowlege with respect to the obligations of an oath," it was *held* that it is the court, and not the judge as an individual, which is to determine the competency of a witness; and there-

fore the examination of the competency of the witness must be made at the trial and in the presence of the prisoner and his counsel. To admit such a witness upon a private examination by the judge, is erroneous. Judge Goldthwaite says: "It may be objected it is scarcely possible that an infant of such tender years can be capable of satisfactorily answering questions amidst the bustle and confusion of a court house; but certainly the consequences would be alarming if the admission of such a witness might be effected through the medium of a private examination; and more so when one made in public had proved to be unsatisfactory." (State v. Morea, 2 Ala., N. S., 275.) And so in The People v. Welsh, 63 Cal., 167, it is said "that a defendant in a criminal case is entitled to have the question of the competency of a presumably incompetent witness heard and determined in his presence, and on his trial before the court and jury." We are clearly of opinion that the procedure here complained of was error.

During the examination of the prosecutrix as a witness, objection was made and exception reserved by defendant when ever the witness was permitted to testify as to other criminal acts of a like character, by the defendant, to the one charged by the indictment to have been committed on or about the twenty-seventh of December, 1885. Wherever and whenever motive and intent become important questions in the trial of a case, evidence of similar acts or conduct in other instances is admis- sible. "It is the *animus* with which an act is done which constitutes its criminality. There must be a joint union of act and intention in every crime, and the intention, like the act, may be proved by direct or indirect evidence of the circumstances connected with the crime. Hence the conduct of a party before and after the principal fact in issue is admissible, not as part of the *res gestœ*, but as a circumstance connected with the act indicating the guilty intent." (People v. Welsh, 63 Cal., 167.) It is permissible, where motive is the important question, to prove other transactions of a similar character. (Street v. The State, 7 Texas Ct. App., 5; Heard v. The State, 9 Texas Ct. App., 1; Cameron v. The State, Id., 332; Williamson v. The State, 13 Texas Ct. App., 514; Jones v. The State, 14 Texas Ct. App., 85; Holmes v. The State, 20 Texas Ct. App., 509.)

But where, however, this is permissible, it is always important that the charge of the court should properly limit and restrict the jury, in their consideration of such testimony, exclusively to

the purposes of its admission, lest they should give it unwarranted weight as evidence proving the main fact. (Kelley v. The State, 18 Texas Ct. App., 262; Holmes v. The State, 20 Texas Ct. App., 509; Alexander v. The State, 21 Texas Ct. App., 407.) In the otherwise unexceptionable charge of the court we find that this important matter was entirely overlooked. It was, however, not excepted to on that ground, but the error is scarcely cured by the fact that in its application of the law to the facts the jury were restricted in their findings by the charge expressly and specifically to a rape committed on or about the twenty-seventh day of December, because, under express provision of the code, a prosecution for rape must be commenced within one year and not afterward. (Code Crim. Proc., Art. 198.) In view of this fact, it was most important—in fact, imperative—that the evidence of acts barred by limitation should be strictly confined to the legitimate purposes for which it was alone admissible and entitled to be considered. A failure to so restrict it is radical error of omission in the charge. (See Davidson v. The State, ante, 372.)

It is a general rule that in the direct examination of a witness he shall not be asked leading questions, or, in other words, questions formed in such a manner as to suggest to the witness the answers desired of him. To this rule, however, there are a few exceptions. "Exceptions are recognized where the witnesses are unwilling; where they are of weak memory, and where such a mode of questioning is logically consistent with a fair and honest development of the case." (Whart. Crim. Ev., 8 ed., sec. 454a.) In Mann v. The State, 44 Texas, 642, it was held that it is in the discretion of the district court to allow direct questions to a witness who shows an unwillingness to testify. In this case it is shown that the witness, on the examining trial, had positively refused to testify, and had to be confined in jail before she would consent to testify. In view of that fact and the further fact that the witness does not appear to be at all bright, we can not say that the court erred in permitting the prosecution on direct examination to ask leading questions.

As charged in the indictment, the rape is alleged to have been committed by *force and threats.* It is, to our minds, left very uncertain from the evidence whether any "force" was used. The prosecutrix testifies that she was struck over the head with a pistol by defendant, but whether during the transaction, or before on the same night, or at some other time, is not made manifest. It

would rather seem that at the particular time whatever offense defendant committed was committed through means of threats, unaccompanied by force, or attempted force, constituting an assault. Appellant was found guilty of assault with intent to commit rape; which offense can only be established by proof of force or attempted force. Proof of threats as a means resorted to in order to accomplish sexual intercourse with a female against her will will not, when unaccompanied by force, authorize a conviction for assault with intent to rape, but would only authorize a conviction for *an attempt* to rape. (Burney v. The State, 21 Texas Ct. App., 565.) We call attention to this matter in view of another trial, where the defendant, having been acquitted of the higher offense of rape, is only liable to be tried for a lesser degree.

For the errors we have discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered December 4, 1886.